**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **GUILFORD THORNTON**, *et al.*, | : | |
| | : | **Case No. 2:15-cv-1337** |
| **Plaintiffs**, | : | |
| | : | **JUDGE ALGENON L. MARBLEY** |
| v. | : | |
| | : | **Magistrate Judge Jolson** |
| **CITY OF COLUMBUS**, *et al.*, | : | |
| | : | |
| **Defendants**. | : | |

## OPINION AND ORDER

This matter is before the Court on the Motions for Summary Judgment of Defendants the

City of Columbus (Doc. 87); Columbus Police Department ("CPD") Officers Danny Dupler and

Jeffrey Kasza (Doc. 85); and CPD Detective Patricia Clark (collectively, "Defendants"). (Doc.

86.) For the reasons set forth below, Defendants' Motions are **GRANTED**.[1]

## I. BACKGROUND

### A. Factual Background

#### 1. The Dispatches

Plaintiffs Guilford and Bonnie Thornton[2] ("Plaintiffs") reside at 1542 Oakwood Avenue,

in Columbus, Ohio. (Am. Compl., Doc. 30, ¶¶ 6–7.) On the evening of Sunday, April 21, 2013,

Thornton placed a non-emergency call to the CPD, reporting that two young black males, whom

he believed to have been perpetrators of an assault that had taken place several days prior, were

walking down the street in front of his house. (*See* Thornton Call Audio Tr., Doc. 76-10;

Detective Patricia Clark Aff., Doc. 72-3, ¶¶ 214–15.) CPD Officer Piotr Derezinski, the officer

---

[1] Defendants' Motions for Leave to File Supplemental Authority (Docs. 101, 102) are also granted.

[2] To avoid confusion, all references in this Opinion and Order to "Thornton" are to Guilford ("Gus")
Thornton. Ms. Thornton will be referred to as "Bonnie Thornton" or "Bonnie."

working patrol in the area, was dispatched to the Thorntons' address at approximately 7:58 p.m. (Doc. 72-3 ¶ 221.) Around the same time, the CPD's 911 center received an emergency call to the Thorntons' address. (Doc. 30 ¶ 17; Doc. 72-3 ¶ 216.) The caller, Thomas A. Davis, Jr., reported that a man at that address had pointed a gun at Davis's son and his friends, and that when Davis approached the man's porch to ask why he had pulled a gun on the kids, the man then pointed the gun at Davis. (Davis Jr. Call Audio Tr., Doc. 76-11.) Davis described the man holding the gun—later determined to be Thornton—as a white male wearing a black shirt and blue jeans. (*See id.*)

CPD dispatch broadcasted this additional information about the events at 1542 Oakwood Avenue. (*See* Doc. 72-3 ¶ 222.) Because the incident now involved firearms, CPD Officers Danny Dupler and Jeffrey Kasza (together, the "Officers"), who were on patrol nearby, volunteered for the run. (*See id.* ¶ 223.) The Officers arrived at the Thorntons' address around 8:00 p.m. (*See id.*)

2. <u>The Home Entry and Shooting</u>

When the Officers arrived at the Thorntons' address, they observed a group of people— mostly black males—gathered outside the house. (Officer Dupler Aff., Doc. 72-1, ¶¶ 22–23; Officer Kasza Aff., Doc. 72-2, ¶¶ 22–23.) The Officers claim that they also saw a white male with a "long gun" standing on the house's front porch, and that the man quickly turned and went inside the residence when he saw their police cruiser approach. (*See* Doc. 72-1 ¶¶ 27–29; Doc. 72-2 ¶¶ 24–25, 28.) Several eyewitnesses confirmed that Thornton was standing on the porch with a gun and then ran inside when the Officers arrived. (*See* Davis Jr. Dep., Doc. 58, at 12:22– 14:5, 26:1–12; Davis III Dep., Doc. 60, at 17:2–9.) Other eyewitnesses, however, maintained that Thornton did not have a gun while standing on the porch, and that Thornton went back

inside his house before the Officers arrived. (*See* Brian Evans Aff., Doc. 75-4, ¶¶ 12–16; Anna Evans Aff., Doc. 75-5, ¶¶ 12–14.) Thornton himself denies having a gun outside and that he saw the Officers. (*See* Thornton Dep., Doc. 54, at 56:9–57:2, 70:15–71:2, 78:6–7.)

When the Officers got out of their cruiser, at least one person in the group gathered outside the Thorntons' home yelled that Thornton had a gun and had just run inside. (Doc. 72-2 ¶ 29; Doc. 75-4 ¶ 12.) The Officers approached the front porch with their service weapons drawn, positioning themselves in between Thornton and the group of people outside. (Doc. 72-1 ¶¶ 32–34; Doc. 72-2 ¶¶ 30–31.) The residence had two doors: a solid wooden interior door that was open, and a closed exterior glass door. (Doc. 72-1 ¶ 40; Doc. 72-2 ¶ 37.) The Officers could see through the closed glass door into the home's entryway and living room, but could not see anyone inside. (Doc. 72-1 ¶ 41; Doc. 72-2 ¶ 38.) There is a dispute about whether and when the Officers actually entered the Thorntons' residence, or simply remained on the porch. (*See* Doc. 85 at 8.) The Officers did, however, announce themselves as police officers and ordered Thornton to drop his weapon and come out. (Doc. 72-1 ¶ 45; Doc. 72-2 ¶ 41.)

Thornton had, in the meantime, gone to retrieve a 12-gauge shotgun from the master bedroom of his house. (Doc. 54 at 70:15–71:8; Bonnie Thornton Dep., Doc. 56, at 45:22–46:20, 48:4–50:3.) While Thornton claimed that he was just "arming up in case whatever" (Doc. 54 at 71:4–8), and that he did not intend to bring the shotgun outside, Bonnie Thornton believed it was his intention to bring the gun outside, and she told investigators this. (*See* Bonnie Thornton Audio Tr., Doc. 76-8, at 15:5–22.) The Officers observed Thornton walking from the bedroom into the living room holding the shotgun. (*See* Doc. 72-1 ¶¶ 46–47; Doc. 72-2 ¶ 43.) According to the Officers, Thornton was walking diagonally toward them, holding the shotgun angled across his body—with "one of his hands under the weapon's barrel, at its pump, and the barrel

itself [] angled upward and to [Thornton's] left . . . . [His] other hand was down near the shotgun's trigger mechanism."  (Doc. 85 at 9 (citing Doc. 72-1 ¶¶ 46–48; Doc. 72-2 ¶¶ 44–45).)  "Although the shotgun was not pointed directly at the Officers, [Thornton] was holding the weapon as though he were ready to turn it toward them and fire it at any moment."  (*Id.* (citing Doc. 72-1 ¶¶ 47–48; Doc. 72-2 ¶¶ 45–47).)  When Thornton entered the living room with his shotgun, he was less than fifteen feet away from the Officers, who were standing side-by-side.  (*See* Doc. 72-1 ¶ 53; Doc. 72-2 ¶ 50.)  The Officers "loudly, repeatedly, and immediately" ordered Thornton to drop his weapon.  (Doc. 85 at 10 (citing Doc. 72-1 ¶ 51; Doc. 72-2 ¶ 48).)  The Officers assert that Thornton was looking right at them, ignored their commands, and refused to drop the shotgun, instead continuing to walk toward the Officers.  (*See* Doc. 72-1 ¶¶ 51–52; Doc. 72-2 ¶ 48.)

The Officers then fired their service weapons at Thornton.  (Doc. 72-1 ¶¶ 58–60; Doc. 72-2 ¶ 49.)  Officer Kasza fired his service weapon once, and Officer Dupler fired twice.  (Doc. 72-1 ¶ 60; Doc. 72-2 ¶ 63.)  According to the Officers, at the time they fired their weapons, Thornton was still holding the shotgun, still refusing to drop it, and still looking right at them.  (*See* Doc. 72-1 ¶¶ 52, 68; Doc. 72-2 ¶ 53.)  Thornton was shot three times: once in each of his hands, and once in his upper left thigh.  (Farbacher Aff., Doc. 73-6, ¶¶ 9–12.)  After being shot, Thornton continued to clutch the shotgun and stumbled toward a chair on the side of the living room that had an assault rifle sitting on it.  (*See* Doc. 72-1 ¶¶ 68–70; Doc. 72-2 ¶¶ 71–75.)

Plaintiffs dispute this version of events.  According to Plaintiffs, Thornton walked into his living room and was shot before he was even aware of the Officers' presence.  (*See* Doc. 54 at 83:10–25, 91:1–9.)  Plaintiffs claim that Thornton never turned toward the front door and instead was heading toward a chair on the far side of the living room.  (*See id.*; *see also id.* at

85:17–86:5.) This is consistent, Plaintiffs argue, with the gunshot wound to Thornton's leg, which "passed from his lateral left thigh to his medial gluteal area, clearly demonstrating that he was shot from the side." (Doc. 90 at 7 (citing Grant Med. Ctr. Emergency Dep't Note, Doc. 81-16).) Additionally, Plaintiffs point to the uncontested fact that Thornton was shot in both hands, but sustained no injuries to the front of his body, even though the Officers assert that Thornton was holding the shotgun at "port arms" and that they aimed at "center of mass/torso." (*See id.* at 8.) Therefore, Plaintiffs argue:

> [w]hen construed in a light most favorable to Plaintiffs, the facts demonstrate that Mr. Thornton was not facing the [Officers], did not look at [the Officers], did not hear their warnings, was not holding his firearm at 'port arms,' did not ignore or refuse [the Officers'] commands, and was instead fired upon without adequate opportunity to comply with their orders.

(*Id.*) Plaintiffs do not dispute that Thornton was holding the shotgun, or that there was an assault rifle on the chair in Thornton's living room.

The Officers ordered Thornton to the ground as soon as he put the shotgun down. (*See* Doc. 72-1 ¶ 72; Doc. 72-2 ¶ 76.) While Officer Kasza held cover over Thornton, Officer Dupler secured the residence. (Doc. 72-1 ¶¶ 73–75; Doc. 72-2 ¶ 81.) One of the officers also informed the CPD dispatch that shots had been fired and that a medic was needed. (*See* Doc. 72-1 ¶ 86; Doc. 72-2 ¶ 77.) This dispatch occurred at about 8:04 p.m. (Doc. 72-3 ¶ 224.) When the Officers had informed the CPD dispatch that they would be responding to the Thorntons' residence, it was about 8:00 p.m. (*See id.* ¶ 223.) Thus, the entire situation unfolded in only about four minutes. And according to the Officers, it took "only seconds" for the Officers to stop the cruiser, get out, and run up to the porch; and there were only about "three to four seconds between Mr. Thornton's entry into the living room with a shotgun and the Officers' shots." (Doc. 85 at 12 (citing Dupler Dep., Doc. 64, at 68:13–69:7).)

### 3. The Officers' Post-Shooting Involvement

While Officer Dupler was securing the residence, Bonnie Thornton came out from the back of the house, and acknowledged hearing the Officers tell her husband multiple times to drop his weapon. (Doc. 56 at 52:25–53:15; Doc. 72-1 ¶¶ 81–82.) When other CPD officers arrived at the scene within ten minutes, the Officers were removed from the scene by members of the Officer Support Team,[3] and taken back to the CPD's 13th Precinct substation. (Doc. 72-1 ¶¶ 87–88; Doc. 72-2 ¶¶ 87–88.) The Officers were separated from each other, and did not speak to each other at all, or to anyone else about the incident. (*See* Doc. 72-1 ¶ 89; Doc. 72-2 ¶ 100.)

Several hours later, the Officers returned to the scene for a walkthrough and for processing. (*See* Doc. 72-1 ¶ 90; Doc. 72-2 ¶ 111.) By this time, the Officers had been provided an attorney by the CPD's collective bargaining unit, the Fraternal Order of Police. (*See* Doc. 72-1 ¶¶ 91–92; Doc. 72-2 ¶¶ 101–07; Pilya Aff., Doc. 73-1, ¶¶ 27–28.) Each officer participated in the walkthrough individually, with his attorney. (Doc. 72-1 ¶¶ 93–94; Doc. 72-2 ¶ 112.) During the walkthrough, the Officers generally described the incident to investigators and indicated where those investigators should focus their search for evidence. (*See* Doc. 73-1 ¶ 38.) These walkthroughs are considered "informal" and are not recorded.[4] (Doc. 85 at 14; *see also* Doc. 73-1 ¶ 39.)

After the walkthrough, each officer was processed separately, in the presence of his attorney. (Doc. 72-1 ¶ 97; Doc. 72-2 ¶ 117.) During processing, which took place in a mobile

---

[3] The CPD's Officer Support Team is a volunteer team of law enforcement officers within the CPD "who have been personally involved in traumatic events and who are trained to provide various forms of assistance, information, and support to other officers when and if those officers are involved in similar events." (Doc. 72-2 ¶ 89.)

[4] The informality of these walkthroughs is "a compromise between the CPD and the FOP." (Doc. 85 at 14.) "CPD investigators get the benefit of involved officers' participation in this important evidence gathering process, while involved officers' [sic] receive only minimal intrusions upon their own constitutional rights as potential suspects." (*Id.*)

command bus stationed near the scene, the Officers were photographed and surrendered their firearms and ammunition (which were also photographed). (Doc. 72-1 ¶¶ 98–99; Doc. 72-2 ¶¶ 118–19.) CPD Sergeant Joan Schlabach also conducted a "round count" on the Officers' firearms and determined that Officer Dupler had fired two rounds, while Officer Kasza had fired one. (Schlabach Aff., Doc. 73-2, ¶¶ 11–13.) While Sergeant Schlabach attempted to obtain a formal statement from the Officers—after informing them of their right to consult with an attorney—both declined to give a formal statement on the night of the incident. (*See* Doc. 73-2 ¶ 16; Doc.72-1 ¶¶ 102–03; Doc. 72-2 ¶¶ 123–24.) The Officers were then sent home, placed on three days' administrative leave, and attended a counseling session with a licensed psychologist before returning to work. (Doc. 72-1 ¶¶ 105–06; Doc. 72-2 ¶¶ 126–28.) They also each prepared a written statement about the incident with the assistance of counsel. (*See* Doc. 72-1 ¶¶ 109–12; Doc. 72-2 ¶¶ 130–33.) The Officers participated in formal interviews before the CPD about the incident approximately ten days after it occurred, and signed their written statements as part of these interviews. (Doc. 72-1 ¶¶ 113–17; Doc. 72-2 ¶¶ 134–38.)

The Officers had no further involvement with the incident until April 2014, when they testified at Thornton's criminal trial on aggravated menacing charges in state court. (*See* Doc. 72-1 ¶¶ 119, 126–27; Doc. 72-2 ¶¶ 141, 150–51.) The Officers played no part in the decision to charge Thornton with aggravated menacing, and did not meet with any prosecutors to prepare for their trial testimony. (Doc. 72-1 ¶¶ 121–25; Doc. 72-2 ¶¶ 145–49.)

### 4. The Investigation

At the time Detective Patricia Clark became involved with the incident, she was a first-shift homicide detective and a member of the CPD's Critical Incident Response Team ("CIRT"), which was called to the Thorntons' residence to respond to a report of a police-involved

shooting.[5] (*See* Doc. 72-3 ¶¶ 17–18.) When Detective Clark arrived on the scene at 9:10 p.m., she met with CPD Sergeant Eric Pilya, who assigned Clark to be CIRT's primary investigator of the incident; Detective Clark assigned CPD Detective Anne Pennington to be the CIRT's crime scene detective. (*See id.* ¶¶ 27–32, 42.) Detective Clark also received preliminary information about the incident from CPD Sergeant Douglas Wilkinson, who was the supervisor of the 13th Precinct during the shooting. (*Id.* ¶ 33.)

As the first part of her investigation, Detective Clark directed another CPD detective to obtain a search warrant to search the Thorntons' residence. (*See id.* ¶¶ 36–37.) Judge Hummer of the Franklin County Municipal Court issued a warrant at approximately 10:45 p.m. on April 21, 2013, and it was executed at 12:18 a.m. on April 22, 2013. (*Id.* ¶¶ 38, 43.) The CPD's crime search unit collected evidence, took photographs, and sketched the scene. (*Id.* ¶ 45.) While processing the scene, the crime search unit seized several firearms from the residence pursuant to the warrant—including the shotgun at issue in the incident and two revolvers. (*Id.* ¶¶ 46–47.) These weapons were tested by the CPD's crime lab, which found the weapons to be operable and also found that the three bullets and spent shell casings found at the scene came from the Officers' service weapons. (*See id.* ¶¶ 53–57.)

Several other CPD detectives also conducted witness interviews with: (1) all of the witnesses at the scene of the incident; (2) Bonnie Thornton; (3) the medics who treated and transported Thornton to Grant Medical Center; (4) the first CPD officers to arrive on scene after the shooting; and (5) the Officer Support Team members who assisted the Officers after the

---

[5] CIRT is a team within the CPD's Homicide Section that is "comprised entirely of detectives and sergeants who have specialized knowledge, training, and experience in homicide and death investigations. Its purpose is to promote standardized and consistent investigations of certain types of serious incidents, such as police-involved shootings, and to complete such investigations in a timely and efficient manner." (Doc. 86 at 2.) Whenever "there is discharge of a firearm by Columbus police officers that results in injury or death, CIRT conducts a criminal investigation of the incident and documents its investigation." (*Id.*)

shooting. (*See id.* ¶¶ 59–73.) Finally, the Wednesday after the incident, members of CIRT canvassed the neighborhood surrounding the Thorntons' residence, in an effort to locate additional witnesses. (*Id.* ¶ 166.)

### 5. Thornton's Attorney's Hospital Visit

At approximately 11:30 a.m. on Monday, April 22, 2013, attorney Krystin Martin, from defense counsel's office, attempted to visit Thornton at Grant Medical Center. (*See* Bonnie Thornton Interrog. Resp., Doc. 54-4, at 2; Verification, Doc. 54-8.) Martin informed the hospital security guard at the emergency desk, April Neu, that she had been retained to represent Thornton and wished to see him. (*See* Neu Aff., Doc. 75-3, ¶ 5.)

Under typical circumstances, when a visitor arrives at the hospital for a patient, Neu asks for the patient's name, confirms his or her status as a patient, and provides the visitor with the patient's room number and directions to the room. (*Id.* ¶ 6.) Thornton, however, had been flagged as "confidential" in the patient log, because he was in police custody. (*See id.* ¶¶ 7, 10–12.) Neu had no knowledge of who had marked Thornton confidential or of CPD's policy on visiting hospital patients in police custody. (*See id.* ¶¶ 8–12.) Because Thornton was marked confidential in the patient log, Neu did not allow Martin to visit him. (*Id.* ¶ 10.)

Later that day, Martin called Assistant City Attorney Jeff Furbee to discuss her inability to visit her client. (*See* Furbee Aff., Doc. 75-2, ¶¶ 3–5.) Furbee then contacted the officers guarding Thornton, and informed them that Thornton's attorneys should be given access to their client. (*See id.* ¶ 6.) Martin visited Thornton later in the afternoon on April 22nd. (Suppression Hr'g Tr., Doc. 83-3, at 52:4–53:7.) There were no other attorney visits (or attempted visits) for the rest of the time Thornton was in the hospital. (Doc. 72-3 ¶¶ 156–57.)

### 6. The Criminal Complaints against Thornton and Detective Clark's Conversation with Thornton at the Hospital

Also on April 22, 2013, Detective Clark filed six criminal complaints for aggravated menacing against Thornton in the Franklin County Municipal Court: one count for each of Thornton's victims. (*See id.* ¶¶ 120–24.) After filing the complaints—which also served as arrest warrants—Detective Clark delivered them to the officers guarding Thornton at the hospital. (*See id.* ¶¶ 135–39.) Prior to doing so, Detective Clark had spoken to Bonnie Thornton on the phone. (*See id.* ¶ 140.) Bonnie informed Detective Clark that she had hired an attorney to represent her husband, and expressed serious concern about his medical condition. (*Id.*) Detective Clark offered to check on Thornton, and told Bonnie that she would report back on Thornton's condition. (*Id.* ¶ 141.)

When Detective Clark went to the hospital, she introduced herself to Thornton as the primary investigator of the incident, asked how he was doing, and informed him that his wife was concerned about him. (*See id.* ¶ 146.) Detective Clark recorded her brief conversation with Thornton. (*See id.* ¶ 148; *see also* Thornton Grant Audio Tr., Doc. 76-6, at 3:16–20.) After this conversation, Detective Clark had no further communications with Thornton while he was in the hospital. (*See* Doc. 72-3 ¶ 151.)

### 7. Detective Clark's Interview with Thornton at the CPD

After Thornton was released from the hospital during the evening of April 25, 2013, he was processed at CPD Headquarters. (*Id.* ¶¶ 173–74.) First, Thornton was taken to an interview room and advised of his constitutional rights. (*Id.* ¶¶ 179–81.) Detective Clark provided Thornton with a form explaining his constitutional rights, and also read it to him. (*See id.* ¶¶ 182–83; *see also* Thornton Rights Form, Doc. 80-4.) Thornton stated that he understood his rights. (Doc. 72-3 ¶ 185.) When he mentioned that he was still on prescription medications

from being in the hospital, Detective Clark asked him if he felt "clearheaded" and if he understood what was happening. (*Id.* ¶ 186.) Thornton responded that he did. (*Id.*) Thornton did inform Detective Clark that he wanted his attorney present before speaking about the incident. (*Id.* ¶ 187.)

Because Detective Clark expected that Thornton would invoke his right to counsel and did not expect to obtain a statement from him at that time, she simply began explaining the rest of the steps in Thornton's processing. (*See id.* ¶¶ 189–90.) When she finished explaining the process, Thornton said: "I'll start talking." (*Id.* ¶ 191.) Thornton laughed after he said it, and Detective Clark laughed in response—thinking that Thornton was joking. (*Id.* ¶ 192.) Detective Clark then asked if he was sure that he wanted to talk to her about the incident. (*Id.* ¶ 193.) Thornton replied: "Yeah, Ask your questions. I'll answer them fair as I can." (*Id.*) Accordingly, Detective Clark believed that Thornton had made knowing, voluntary, and intelligent waiver of his rights, and began to interview him about the incident. (*Id.* ¶ 194.) The interview was both video and audio recorded. (*Id.* ¶ 195.) Detective Clark had no further communications with Thornton after the interview. (*See id.* ¶ 200.)

### 8. Criminal Proceedings

Thornton's criminal trial in the Franklin County Municipal Court began on April 21, 2014. (Franklin Cty. Muni. Ct. Trial Tr., Vol. I, Doc. 83-5, at 7:1–2.) Ultimately, Thornton was acquitted on one of the six counts of aggravated menacing, and the jury hung on the remaining five counts. (Verdict, Doc. 83-7.) Plaintiffs allege in their Amended Complaint that the jury hung 7–1 in favor of acquittal, but offer no evidence to support this allegation. (*See* Doc. 30 ¶ 50.) In May 2014, the prosecution dismissed the remaining five counts of aggravated menacing. (Dismissal Entry, Doc. 83-9.)

**B. Procedural Background**

Plaintiffs filed their original complaint in April 2015, asserting eleven claims against the current Defendants, plus the CPD and CPD Chief Kim Jacobs. (*See* Compl., Doc. 2.) The CPD and Chief Jacobs filed motions to dismiss (Docs. 9, 11), which Plaintiffs did not oppose. Thus, at the July 2015 preliminary pretrial conference, with the agreement of all the parties, the Court dismissed the CPD and Chief Jacobs from the case. (*See* Doc. 16.)

The City of Columbus (the "City") had filed a motion to dismiss Plaintiffs' claims one month before the July 2015 pretrial conference. (*See* Def.'s Mot. to Dismiss, Doc. 12.) The Court granted the City's motion, dismissing Plaintiffs' state-law claims with prejudice and their federal claims without prejudice, and granting Plaintiffs leave to file an amended complaint asserting federal claims consistent with its Opinion and Order within fourteen days. (Order, Doc. 29.) Plaintiffs filed their amended complaint on March 31, 2016. (Doc. 30.)

Currently before the Court are three motions for summary judgment: (1) the Officers' motion; (2) Detective Clark's motion; and (3) the City's motion, which are ripe for adjudication.

## II. LAW AND ANALYSIS

### A. Standard of Review

Federal Rule of Civil Procedure 56(a) provides, in relevant part, that summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." A fact is deemed material only if it "might affect the outcome of the lawsuit under the governing substantive law." *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The nonmoving party must then present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris*

*Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993). The mere possibility of a factual dispute is insufficient to defeat a motion for summary judgment. *See Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992). Summary judgment is inappropriate, however, "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The necessary inquiry for this Court is "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Patton v. Bearden*, 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251–52). In evaluating such a motion, the evidence must be viewed in the light most favorable to the nonmoving party. *United States S.E.C. v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013). The mere existence of a scintilla of evidence in support of the opposing party's position will be insufficient to survive the motion; there must be evidence on which the jury could reasonably find for the opposing party. *See Anderson*, 477 U.S. at 251; *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995).

### B. 42 U.S.C. § 1983 and Qualified Immunity

Under 42 U.S.C. § 1983:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

To state a claim under § 1983, Plaintiffs must set forth facts that, "when construed favorably, establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Sinclair v. Lauderdale Cty.*, 652 F. App'x 429, 433 (6th Cir. 2016) (citation omitted). Because the parties agree that Defendants

13

were acting under the color of state law at all times, only the first prong of the test is in dispute here. (*See* Doc. 85 at 19; Doc. 90 at 9.)

In their motion, the Officers raise the defense of qualified immunity. "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. Al-Kidd*, 563 U.S. 731, 735 (2011) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). On summary judgment, "the court must analyze these questions after construing the facts in the light most favorable to the party asserting the injury and drawing all reasonable inferences in that party's favor." *Brown v. Chapman*, 814 F.3d 447, 457 (6th Cir. 2016) (citation omitted). "These questions may be answered in any order; if either one is answered in the negative, then qualified immunity protects the official from civil damages." *Id.* (citation omitted).

### C. *Monell* Liability

All of Plaintiffs' claims against the City are brought under § 1983. In order for Plaintiffs to obtain liability against a municipality under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), they must establish that: (1) their constitutional rights were violated; and (2) the municipality's policy or custom led to the violation. *Garner v. Harrod*, 656 F. App'x 755, 760 (6th Cir. 2016) (citation omitted). Contrary to Plaintiffs' assertion, *respondeat superior* or vicarious liability will not attach under § 1983; a municipality can only be held liable under § 1983 where the municipality *itself* causes the constitutional violation at issue. *Id.* (citation omitted); *see also Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013) ("A municipality may not be sued under § 1983 for an injury inflicted solely by its employees or agents.").

As set forth below, all of Plaintiffs' claims fail at step one, because they cannot establish any violations of their constitutional rights. However, were Plaintiffs able to clear this hurdle, they could make a showing of an illegal policy or custom by demonstrating one of the following: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Burgess*, 735 F.3d at 478. Plaintiffs cannot establish a genuine issue of material fact under any of these theories.

First, while Plaintiffs allege that the City has created a "network of policies designed to assist and protect officers who have engaged in unconstitutional and unlawful conduct," (Doc. 30 ¶ 69), Plaintiffs have not entered any such policies into evidence, and concede as much. (*See* Doc. 96 at 5.) Second, Plaintiffs' ratification theory claim is based on the fact that the CPD found that the shooting of Thornton was "within policy" after reviewing the circumstances of the incident. (*See id.* at 7.) But Plaintiffs must prove that the "ratification was a moving force in causing the constitutional violation." *Stillwagon v. City of Delaware*, 175 F. Supp. 3d 874, 904 (S.D. Ohio 2016). The City correctly notes that here, its purported ratification of the Officers' conduct "cannot logically be the moving force behind the alleged constitutional violation," because it occurred *after* the shooting, and "a thing that happens after an event cannot logically be said to have caused the event that preceded it." (*See* Doc. 87 at 9.)

As for failure to train, to constitute a § 1983 violation, "a municipality's failure to train its employees in a relevant respect must amount to deliberate indifference to the rights of persons with whom the untrained employees come into contact." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (quotation omitted). Plaintiffs conceded during discovery that they lacked evidence of a

pattern of similar constitutional violations sufficient to support a failure-to-train theory. (*See* Doc. 87 at 10 (citing Thornton Interrog. Resp., Doc. 54-5, 10–13, 15; Thornton Resp. to Requests for Production, Doc. 54-5, 24–33).) Instead, Plaintiffs attempt to repackage their "failure-to-investigate" theory as a failure-to-train theory. Finally, in an effort to support their custom-of-tolerance theory, Plaintiffs submit logs (*see* Docs. 92–95) from the CPD's Firearms/Police Involved Death Review Board ("FPD") and note that, in the vast majority of cases, CPD officers were found to be "within policy" after the occurrence of a fatal shooting. (*See* Doc. 96 at 8.) But a custom-of-tolerance claim requires "a showing that there was a pattern of inadequately investigating similar claims." *Burgess*, 735 F.3d at 478. Plaintiffs have provided no evidence that the claims contained in the FPD logs were similar, or even authenticated the documents.

For all of these reasons, Plaintiffs' *Monell* claims fail. Accordingly, the City is entitled to summary judgment on all of Plaintiffs' claims against it (Counts I, II, III, V, VI, VII, VIII, IX, X, XI of the Amended Complaint).[6]

### D. Counts I & II – § 1983 (Violation of Plaintiffs' Fourth Amendment Rights – Unreasonable Search)

Counts I & II of Plaintiffs' Amended Complaint allege that the City and the Officers violated Plaintiffs' right to be free from unreasonable searches under the Fourth Amendment due to the Officers' warrantless entry into the Thorntons' residence. (*See* Doc. 30 ¶¶ 56–65.)

---

[6] Plaintiffs concede that their claims against the Officers and Detective Clark in their official capacities are duplicative of their claims against the City. (*See* Doc. 91 at 5.) Accordingly, these claims are dismissed. Additionally, Count VI of Plaintiffs' Amended Complaint alleges a Fourth Amendment violation against the City for its allegedly unreasonable seizure of Plaintiffs' firearms from their residence during the execution of the search warrant after Thornton was shot. (*See* Doc. 30 ¶¶ 86–90.) Because this claim was brought against only the City—and, as discussed above, all of Plaintiffs' claims against the City fail—the Court will not address it further, even though Detective Clark briefly addresses it in her motion because the firearms were seized as part of the investigation she led. (*See* Doc. 86 at 16–19.)

The Fourth Amendment to the United States Constitution guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend IV. When a "search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing, . . . reasonableness generally requires the obtaining of a judicial warrant." *Riley v. California*, 134 S. Ct. 2473, 2482 (2014) (internal quotation marks and citation omitted). The Supreme Court has recognized that the warrant requirement may be overcome in some circumstances because "the ultimate touchstone of the Fourth Amendment is reasonableness." *Kentucky v. King*, 563 U.S. 452, 459 (2011) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (internal quotation marks omitted)). The warrant requirement is therefore subject to certain exceptions. *Id.* If a warrantless search falls within a specific exception to the warrant requirement, it is reasonable. *Riley*, 134 S. Ct. at 2482. One such exception permits warrantless searches under "exigent circumstances." *Walters v. Stafford*, 317 F. App'x 479, 489 (6th Cir. 2009) (citation omitted). While the list of exigent circumstances is not "exhaustive or inflexible," courts have found exigent circumstances to exist when "(1) officers were in hot pursuit of a fleeing suspect; (2) the suspect represented an immediate threat to the arresting officers and public; or (3) immediate police action was necessary to prevent the destruction of vital evidence or thwart the escape of known criminals." *Id.* (quotation omitted).

Whether exigent circumstances exist is generally a fact issue for a jury. *See Hancock v. Dodson*, 958 F.2d 1367, 1375 (6th Cir. 1992). But in cases "where the underlying facts are essentially undisputed, and where a finder of fact could reach but one conclusion as to the existence of exigent circumstances, the issue may be decided by the trial court as a matter of law." *Id.* Here, there is a factual dispute as to whether the Officers saw Thornton on his front

porch with a gun when they first arrived on the scene, and as to whether the Officers actually entered Thornton's residence. Construing the facts most favorably to Plaintiffs and assuming that the Officers did not observe Thornton when they first arrived, and that they entered his residence, exigent circumstances existed such that their entrance into the residence was reasonable.

As set forth above, the Officers were responding to a call that an unknown man was threatening others with a gun. When they arrived at the Thorntons' residence, a group of people had gathered outside and informed the Officers that the man who had been threatening people with his gun still possessed that gun, and had run inside the house. The case law is clear that exigent circumstances existed under these facts—as the Officers reasonably believed that they or the inhabitants of the residence were in danger, given that an individual who had demonstrated willingness to use the weapon was inside. The Officers correctly note that they did not need to see Thornton enter the house with a gun for the exigency to reasonably exist, *see, e.g.*, *Warden v. Hayden*, 387 U.S. 294, 298 (1967) (finding exigent circumstances where officers learned from a dispatcher that an armed robber ran into a residence), and that the fact that Thornton had purportedly only threatened someone with a gun rather than actually firing it at anyone did not decrease the exigency they faced. *See United States v. Johnson*, 106 F. App'x 363, 368 (6th Cir. 2004) ("Police are not required to wait for injury or death to occur in their presence before acting to protect people from a gunman who has amply demonstrated his propensity to use his weapon.").

Plaintiffs' rebuttal to the Officers' arguments has no basis in law. According to Plaintiffs, the information dispatched to the Officers was that "an individual on the [Thorntons'] porch '*pulled* a gun on the [911] caller.'" (Doc. 90 at 11 (citing Doc. 53; Doc. 72-1 ¶ 18

(emphasis added)).)  Therefore, Plaintiffs argue, because the dispatcher did not specifically say that Thornton was *threatening* someone with a gun, this information was "entirely neutral," as it is "not unlawful to possess a firearm, have a firearm in one's hand, have a firearm on one's porch, or in one's home."  (*Id.*)  Plaintiffs' argument is a futile exercise in semantics.  It is difficult to imagine how "pulling a gun" on someone can be construed as anything other than threatening an individual with a gun.  Because exigent circumstances existed, the Officers' warrantless entry into Plaintiffs' home did not constitute a Fourth Amendment violation.

Although the Court need not reach the second question, it is worth noting that "an even more compelling case can be made that the Officers did not violate a right that was clearly established on April 21, 2013."  (Doc. 85 at 26.)  In *Gradisher v. City of Akron*, 794 F.3d 574 (6th Cir. 2015), the plaintiff asserted that his right to be free from a warrantless forced entry was clearly established on September 2, 2011, but the Sixth Circuit found that the issue was too generally framed.  *See id.* at 584.  Rather, under the factual circumstances in *Gradisher*, the Court found that the appropriate question to ask was: "whether, on September 2, 2011, it was clearly established that no exigent circumstance exists when officers enter a residence in response to multiple erratic 911 calls from there and when they believe that someone inside may have threatened the use of a gun."  *Id.*  The Court noted that law enforcement officers are entitled to the benefit of the doubt under the qualified immunity standard, even if the officers' belief that someone inside a residence could be in danger is a "close question."  *See id.* at 585.

As the Officers appropriately point out, in *Gradisher*, the police officers' belief that there were exigent circumstances justifying a warrantless entry into a residence were based on multiple calls from an individual who was simply harassing a 911 dispatcher, and a vague report from a bartender of a male who claimed to have a gun in his van.  *See id.* at 584.  In this case, the

Officers' belief in the existence of exigent circumstances was based on a specific phone call to 911 indicating that an individual at a particular address was threatening others with a gun, and follow-up information from a crowd of witnesses that the individual had disappeared into a residence with a gun. Framing the issue specifically, as the *Gradisher* court directed, it was not clearly established on April 21, 2013 that "no exigent circumstances exist when officers enter a residence in response to a 911 report that a man was standing on the residence's porch threatening people with a gun," and when "people just outside that residence inform the officers upon arrival that the man still had the gun and had just gone inside."[7] (Doc. 85 at 28.)

Because there was no constitutional violation committed by the Officers, and even if there were, because they are entitled to qualified immunity, the Officers are entitled to summary judgment on Counts I and II of Plaintiffs' Amended Complaint.

### E. Count III – § 1983 (Violation of Guilford Thornton's Fourth Amendment Rights – Unreasonable Seizure)

Count III of Plaintiffs' Amended Complaint alleges that the Officers' use of deadly force in apprehending Thornton was "unreasonable under the prevailing circumstances and violated his right to be free from unreasonable seizures as guaranteed by the Fourth Amendment to the United States Constitution," and thus the Officers and the City are liable for damages. (Doc. 30 ¶ 67; *see id.* ¶¶ 66–71.)

Excessive force claims are evaluated under a Fourth Amendment reasonableness standard. *See Graham v. Connor*, 490 U.S. 386, 395 (1989).[8] Proper application of this standard

---

[7] Plaintiffs wholly overlook *Gradisher* in their briefing, and instead rely on *Lopez v. City of Cleveland*, 625 F. App'x 742 (6th Cir. 2015), a factually distinguishable case involving a plaintiff armed with a machete, rather than a shotgun.

[8] On May 30, 2017, Defendants filed a motion for leave to file supplemental authority (Doc. 102), to draw the Court's attention to the Supreme Court's decision in *County of Los Angeles v. Mendez*, 581 U.S. ___ (2017), issued the same day. In *Mendez*, the Court confirmed that the standard for evaluating excessive

"requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396 (citing *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985)). The "reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (citing *Terry v. Ohio*, 392 U.S. 1, 20–22 (1968)).

Here, the Officers responded to a report of a man later identified to be Thornton standing on the front porch of a residence and threatening others with a gun. The Officers exited their cruiser to see a group of people standing outside the Thorntons' residence, several of whom informed the Officers that Thornton had run inside, and still had the gun in his possession. The Officers were uncertain of who the armed man was, whether the home was Thornton's, and who else might be inside the home. After moving onto the porch and seeing Thornton emerge from the back of the house with a shotgun and walk toward them, the Officers drew their weapons and ordered Thornton to drop the gun. According to the Officers, Thornton clearly heard their orders and refused to drop the weapon; continuing to move toward them. After Thornton refused to obey their commands, the Officers opened fire, shooting Thornton in both hands and his left thigh.

In sum, "[g]iven the way Mr. Thornton was holding the shotgun, the short distance between him and the Officers, [and] the virtually nonexistent distance between the Officers themselves, it would have taken a split second for Mr. Thornton to lower the barrel toward them,

---

force cases, established in *Graham v. Connor*, 490 U.S. 386, 395 (1989), remains the operative standard, and held that the Fourth Amendment provides no basis for the Ninth Circuit's "provocation rule," which permits a different Fourth Amendment violation to transform a later, reasonable use of force into an unreasonable seizure.

pull the trigger and cause death or serious physical injury to each Officer or both Officers simultaneously." (Doc. 85 at 34.) Thus, the Officers assert that their belief that Thornton posed an immediate threat to their safety was reasonable, and they were justified in their use of deadly force.

Plaintiffs claim that the Officers presented a "one-sided version of the shooting" and argue that genuine issues of material fact preclude summary judgment on Count III. (*See* Doc. 90 at 17.) Specifically, Plaintiffs again fall back on their argument that the Officers were only advised that Thornton had "pulled a gun" on a 911 caller, not that he had actually "threatened" anyone with a gun. Additionally, Plaintiffs assert that: (1) rather than walking toward the Officers, Thornton was actually walking toward a chair on the side of the living room; (2) Thornton did not see the Officers or hear their commands; and (3) that there was a period of only three to four seconds between Thornton entering the room and the shooting.[9] (*See id.* at 19.) According to Plaintiffs, because there are issues of fact as to whether Thornton saw or heard the Officers, had time to comply with their orders, and whether Thornton was actually facing or walking toward the Officers, summary judgment is inappropriate.

Notably, however, Plaintiffs *do not* dispute that Thornton was armed with a shotgun, and that the armchair in the living room toward which Thornton was allegedly walking had an assault rifle resting on it. Further, while Plaintiffs asserted at oral argument that Thornton could not hear the Officers' commands due to the volume of the television that he was standing next to, Bonnie Thornton testified that she heard the Officers order her husband to drop his gun multiple times— and she was a greater distance away from the Officers than Thornton was.

Whether the Officers are entitled to summary judgment on this claim turns on whether an officer must wait until a suspect actually points his or her deadly weapon at the officer before the

---

[9] The Officers agree with this timeframe.

officer can reasonably perceive a sufficiently serious threat to employ deadly defensive force. At the time that the Officers' motion was briefed, the Sixth Circuit had not opined on this issue, so the Officers relied on two district court decisions: *Leong v. Detroit*, 151 F. Supp. 2d 858 (E.D. Mich. 2001) and *Sweat v. Shelton*, No. 3:10-0589, 2012 WL 2808980 (M.D. Tenn. July 10, 2012). In *Leong*, the plaintiff offered a forensic pathologist's report to show that the decedent had actually been facing away from police officers when shot. 151 F. Supp. 2d at 864. The court found the decedent's position at the time of the shooting irrelevant, noting that a "bright-line rule which depended solely upon such facts would run afoul of the Supreme Court's express recognition that police officers frequently must make 'split-second judgments under 'circumstances that are tense, uncertain, and rapidly evolving.'" *Id.* at 865–66 (quoting *Graham*, 490 U.S. at 396–97). Similarly, in *Sweat*, although the court denied summary judgment for other reasons, it noted that it was "in no way suggesting that an officer must wait until a suspect actually points a weapon at him or must also issue a warning before using deadly force, and this is true even when the suspect's back is to the officer." 2012 WL 2808980, at *9.

While the Officers' summary judgment motion was pending, the Sixth Circuit issued an opinion holding that a suspect need not raise a weapon to an officer before the officer can reasonably perceive a significant threat to his life. *See Thomas v. City of Columbus*, 854 F.3d 361, 365–66 (6th Cir. 2017) (affirming officer's entitlement to qualified immunity). To be clear, the Sixth Circuit *did not* hold that "an officer may shoot a suspect merely because he has a gun in his hand." *Id.* at 366. Rather, whether the suspect has a weapon is just one factor in assessing the totality of the circumstances. *Id.*

In light of the foregoing, Plaintiffs' arguments that there are genuine issues of material fact as to whether Thornton was walking directly toward the Officers with his weapon raised are

unavailing.  Viewing all of the facts and circumstances—set forth above—from the perspective of a reasonable officer on the scene, the Officers' belief that Thornton posed an immediate threat to their safety was reasonable, and they were justified in their use of deadly force.  Of particular note to the Court is the fact that Thornton was undisputedly armed, was walking toward an assault rifle, and that Bonnie Thornton heard the Officers order her husband multiple times to drop his weapon.

For all of these reasons, the Officers are entitled to summary judgment on Plaintiffs' excessive force claim.[10]

---

[10] The use of excessive force by police against civilians is not an insignificant problem, and occurs with unsettling frequency.  In a manner that could only bespeak twisted logic, Thornton—who approached the Officers with a shotgun while walking toward an assault weapon in a small room—should consider himself fortunate not to have been killed.  A number of unarmed young men, a disproportionate number of whom were black, did not enjoy Thornton's fate—they were instead killed.  In the past several years alone, there has been a rash of police shootings and other uses of excessive force against individuals who were either unarmed or presented no threat of physical harm to the officers.  Among others:

- Walter Scott, a fifty-year-old unarmed black man, was fatally shot eight times in the back by a police officer as he was fleeing after a routine traffic stop.  Alan Blinder, *Ex-Officer Who Shot Walter Scott Pleads Guilty in Charleston*, N.Y. Times (May 2, 2017), https://www.nytimes.com/2017/05/02/us/michael-slager-walter-scott-north-charleston-shooting.html.

- Laquan McDonald, a seventeen-year-old black teenager, was fatally shot by an officer while walking away from the police.  Wayne Drash, *The Killing of Laquan McDonald: The Dashcam Video vs. Police Accounts*, CNN (Dec. 19, 2015), http://www.cnn.com/2015/12/17/us/laquan-mcdonald-video-records-comparison.  Though possessing a knife, Mr. McDonald did not advance on, lunge at, or otherwise threaten the officer who, within thirty seconds of arriving at the scene, fired sixteen shots at McDonald.  Polly Mosendz, *Chicago Officials Release Video of White Police Officer Shooting Black Teenager*, NEWSWEEK (Nov. 11, 2015), http://www.newsweek.com/chicago-police-officer-charged-murder-black-teenager-398031.

- Samuel Dubose, an unarmed black man, was shot and killed by an officer during a routine traffic stop.  Richard Pérez-Peña, *University of Cincinnati Officer Indicted in Shooting Death of Samuel Dubose*, N.Y. Times (July 29, 2015), https://www.nytimes.com/2015/07/30/us/university-of-cincinnati-officer-indicted-in-shooting-death-of-motorist.html.  The subsequently released video of the incident showed that Mr. Dubose did not provoke or threaten the officer before deadly force was used.  *Id*.

- Michael Brown, an unarmed black teenager, was shot and killed while retreating after an altercation with an officer. U.S. DEP'T OF JUSTICE CIVIL RIGHTS DIV., REPORT REGARDING THE CRIMINAL INVESTIGATION INTO THE SHOOTING DEATH OF MICHAEL BROWN BY FERGUSON, MISSOURI POLICE OFFICER DARREN WILSON 4 (2015), http://www.justice.gov/sites/default/files/opa/pressreleases/attachments/2015/03/04/doj_report_on_shooting_of_michael_brown_1.pdf. Though some factual disputes existed as to whether Mr. Brown posed a threat to the officer, *id.* at 82–83, the incident served as the catalyst for the report that conclusively found that the Ferguson Police Department had engaged in discriminatory practices towards African Americans, in particular through the use of excessive force. U.S. DEP'T OF JUSTICE CIVIL RIGHTS DIV., INVESTIGATION OF THE FERGUSON POLICE DEPARTMENT 28 (2015), http://www.justice.gov/sites/default/files/opa/press-releases/attachments/2015/03/04/ferguson_police_department_report.pdf.

- Philando Castile, lawfully registered to carry a firearm, was shot and killed by an officer who suspected him of a robbery based on his appearance. *See* Stephen Rex Brown, *Philando Castile Had a Permit for the Gun He Carried When Minnesota Cop Shot Him to Death*, N.Y. DAILY NEWS (July 9, 2016, 4:18 PM), http://www.nydailynews.com/news/national/philando-castileminnesotagun-permit-article-1.2705537; Julia Jacobo & Enjoli Francis, *Cops May Have Thought Philando Castile Was a Robbery Suspect, Noting 'Wide-Set Nose,' Dispatch Audio Indicates*, ABC NEWS (July 11, 2016, 10:09 PM), http://abcnews.go.com/US/copsthoughtphilando-castile-robbery-suspect-dispatch-audio/story?id=40439957. Mr. Castile's girlfriend, present at the time of the shooting, stated that the officer fired his weapon four times after Mr. Castile attempted to get his ID and wallet. *Minn. Man Fatally Shot by Police while Inside a Car with a Woman and Child*, NPR: Around the Nation (July 7, 2016, 1:58 AM), http://www.npr.org/2016/07/07/485049343/minn-man-shot-by-police-while-inside-a-car-with-a-woman-and-child.

- Tamir Rice, a twelve-year-old boy carrying a toy gun, was shot and killed within seconds of police officers responding to a 911 call in which the caller described the firearm as "probably fake." L.A. Times Staff, *Hear the 911 Call About Tamir Rice: Gun is 'Probably Fake,' Caller Says*, L.A. TIMES (Nov. 26, 2014, 5:59 PM), http://www.latimes.com/nation/nationnow/la-na-nn-tamir-rice-911-call-20141126-htmlstory.html.

- Levar Jones, an unarmed thirty-five-year-old man, was in the parking lot of a South Carolina gas station, and reached into his vehicle to get his driver's license after a state highway patrol trooper asked for it. *Video Shows Trooper Shooting Unarmed Man, South Carolina Police Say*, CNN (Sept. 26, 2014), http://www.cnn.com/2014/09/25/justice/south-carolina-trooper-shooting/index.html. Within seconds, the trooper fired at least four shots at Jones, who stepped away from the vehicle with his hands in the air. *Id.* Jones asked the trooper why he shot him, as he was simply complying with the trooper's order to provide his driver's license. *Id.* Jones was shot in the hip and later released from the hospital. *Id.*

- Amadou Diallo, an unarmed West African immigrant, was killed by four New York City police officers who fired forty-one shots at him in the doorway of his apartment building. Michael Cooper, *Officers in Bronx Fire 41 Shots, and an Unarmed Man Is Killed*, N.Y.

### F. Count IV – Assault and Battery (Responding Officers' Malicious Conduct)

Count IV of Plaintiffs' Amended Complaint alleges assault and battery against the

Officers.  (Doc. 30 ¶¶ 72–75.)  State-law tort claims against political subdivisions of the State of

Ohio or its employees are governed by Ohio's Political Subdivision Tort Liability Act.  *See* Ohio

Rev. Code Ch. 2744; *see also Rivers v. Bowers*, No. 2:06-CV-712, 2008 WL 2079406, at *12

(S.D. Ohio May 15, 2008) (applying Ohio Revised Code Ch. 2744 because it was "beyond

question that the City of Columbus is a "political subdivision" within the meaning of the statute

and that its officers were engaging in either a "governmental or proprietary function").  Under

Section 2744.04(A) of the Ohio Revised Code:

> An action against a political subdivision to recover damages for injury, death, or
> loss to person or property allegedly caused by any act or omission in connection

---

Times (Feb. 5, 1999), http://www.nytimes.com/1999/02/05/nyregion/officers-in-bronx-fire-41-shots-and-an-unarmed-man-is-killed.html.

- Eric Garner, a forty-three-year-old unarmed man was confronted by police officers trying to arrest him for selling illegal cigarettes.  *New York Man Dies After Chokehold by Police*, CNN (Dec. 8, 2014), http://www.cnn.com/2014/07/20/justice/ny-chokehold-death/index.html.  Mr. Garner raised his hands in the air and told officers not to touch him, but within seconds one of the officers placed him in a chokehold and pulled him to the sidewalk.  *Id.*  Mr. Garner, an asthmatic, repeatedly cried that he couldn't breathe.  *Id.*  He suffered a heart attack and died en route to the hospital.  *Id.*

These acts of police violence are readily distinguishable from the Officers' shooting of Thornton. While the victims of these shootings were unarmed and nonthreatening, and the involved officers improperly used lethal force due to a lack of sufficient information or responded too readily to perceived dangers, here there is no dispute that Thornton was armed with a shotgun and moving toward an even more deadly assault rifle.

with a governmental or proprietary function, whether brought as an original action, cross-claim, counterclaim, third-party claim, or claim for subrogation, shall be brought *within two years after the cause of action accrues, or within any applicable shorter period of time for bringing the action provided by the Revised Code*. (Emphasis added).

Section 2305.111(B) of the Ohio Revised Code provides that "an action for assault and battery shall be brought within one year after the cause of action accrues." For the purposes of this section, "a cause of action for assault and battery accrues upon the date . . . on which the alleged assault or battery occurred." Ohio Rev. Code § 2305.111(B). Here, the parties do not dispute that the incident occurred on Sunday, April 21, 2013. Thus, Plaintiffs should have brought their state-law tort claims on or before April 21, 2014. Because Plaintiffs did not file this lawsuit until April 17, 2015, their assault and battery claim is untimely. (*See* Compl., Doc. 2.) Indeed, Plaintiffs concede as much. Accordingly, the Officers are entitled to summary judgment on Count IV of Plaintiffs' Amended Complaint.

### G. Count VII – § 1983 (Violation of Bonnie Thornton's Fourteenth Amendment Rights – Loss of Consortium)

Count VII of Plaintiffs' Amended Complaint alleges that, as a result of the Officers' "unreasonable use of deadly force, which was ratified and caused by" the City, Bonnie Thornton suffered a loss of consortium. (*See* Doc. 30 ¶¶ 91–93.) Plaintiffs style Bonnie Thornton's loss of consortium claim as a § 1983 claim and a violation of her Fourteenth Amendment rights. (*See id.* at 18.) However, "[i]n the Sixth Circuit, a section 1983 cause of action is entirely personal to the direct victim of the alleged constitutional tort." *Claybrook v. Birchwell*, 199 F.3d 350, 357 (6th Cir. 2000) (citing *Jaco v. Bloechle*, 739 F.2d 239, 241 (6th Cir. 1984)). "Accordingly, only the purported victim, or his estate's representative(s), may prosecute a section 1983 claim; conversely, no cause of action may lie under section 1983 for emotional distress, loss of a loved

one, or any other consequent collateral injuries allegedly suffered personally by the victim's family members." *Id.*

This does not mean, however, that Plaintiffs are barred from bringing a pendent state-law loss of consortium claim *alongside* the § 1983 claim. *See Kinzer v. Metro. Gov't of Nashville*, 451 F. Supp. 2d 931, 945 (M.D. Tenn. 2006). Indeed, Plaintiffs admit that Bonnie Thornton's "federal claim under the Fourteenth Amendment fails for the reasons set forth by Defendants," but "respectfully submit that her derivative state law claim survives." (Doc. 90 at 24.) But Plaintiffs have not asserted a state-law loss of consortium claim; the only reference to loss of consortium in their Amended Complaint is in the context of Count VII—which is styled as a Fourteenth Amendment claim. Because Plaintiffs have failed to plead a state-law loss of consortium claim, the Officers are entitled to summary judgment on Count VII.

### H. Count VIII – § 1983 (Violation of Guilford Thornton's Fourth Amendment Rights – Unreasonable Seizure)

Count VIII of the Amended Complaint alleges that all Defendants are liable for a violation of Thornton's right to be free from unreasonable seizures under the Fourth Amendment. (*See* Doc. 30 ¶¶ 94–104.) Specifically, Plaintiffs accuse the Officers of providing "materially false statements regarding the factual circumstances of the shooting" and offering perjured testimony during Thornton's criminal trial in state court. (*See id.* ¶¶ 96, 99.) Plaintiffs also allege that Detective Clark charged Thornton with six counts of aggravated menacing without probable cause. (*See id.* ¶ 97.) Finally, Plaintiffs claim that the City's policies led to Thornton being kept in isolation and handcuffed to a bed in the hospital despite the absence of any criminal proceedings being instituted against him, and that the City's policies also gave rise

to the violations allegedly committed by Detective Clark and the Officers.[11] (*See id.* ¶¶ 95, 101–02.)

With regard to Plaintiffs' claims against the Officers, there is no evidence in the record that the Officers provided false statements about the shooting. Certainly, there are disputed facts about the shooting (e.g., whether the Officers entered the Thorntons' residence or shot from the porch; whether the Officers saw Thornton on the porch when they pulled up in their cruiser or Thornton was already inside the house, etc.), but Plaintiffs offer no evidence—aside from mere speculation—that the Officers willfully lied about the facts of the incident. "A properly supported motion for summary judgment will not be defeated by conclusory allegations, speculation and unsubstantiated assertions." *Bradley v. Wal-Mart Stores E., LP*, 587 F. App'x 863, 866 (6th Cir. 2014). Further, Plaintiffs concede that witness immunity bars their malicious prosecution claim against the Officers. (*See* Doc. 90 at 28.)

For Plaintiffs to succeed on their malicious prosecution claim against Detective Clark, they must establish that: (1) a criminal prosecution was initiated against Thornton and Detective Clark made, influenced, or participated in the decision to prosecute; (2) there was no probable cause for the criminal prosecution; (3) as a consequence of the legal proceeding, Thornton suffered a deprivation of liberty apart from the initial seizure; and (4) the criminal proceeding was resolved in the Thornton's favor. *Robertson v. Lucas*, 753 F.3d 606, 616 (6th Cir. 2014). At issue here are elements two and four.

Probable cause exists when "the facts and circumstances within the officer's knowledge are sufficient to warrant a prudent person, or one of reasonable caution, in believing that the suspect has committed, is committing, or is about to commit an offense." *Bailey v. Howell*, 643

---

[11] Plaintiffs concede that they have failed to identify any City policies instructing CPD officers to deprive individuals of their constitutional rights. (*See* Doc. 96 at 5.)

F. App'x 589, 595 (6th Cir. 2016). Under Ohio Revised Code Section 2903.21, "no person shall knowingly cause another to believe that the offender will cause serious physical harm to the person or property of the other person . . . ." Ohio Rev. Code § 2903.21(A). Under this aggravated menacing statute, flashing or brandishing a firearm is sufficient to establish probable cause. *Manuel v. City of Columbus*, 86 F. App'x 852, 855 (6th Cir. 2004) (citation omitted). Both parties' briefing gets bogged down in irrelevant issues on this matter. Defendants argue that there was enough probable cause to even support the more serious charge of felonious assault—even though Thornton was never charged with that crime. (*See* Doc. 85 at 51.) Plaintiffs simply argue that the facts of the shooting are disputed. But there is more than enough evidence in the record, from multiple witnesses, to show that Thornton brandished a gun—even if the Officers' testimony were discounted.

As for the favorable resolution element, Thornton was acquitted on one of the six aggravated menacing counts with which he was charged, but the jury hung on the remaining five counts. Plaintiffs allege—without providing corroborating evidence—that the jury hung 7–1 in favor of acquittal. (*See* Doc. 30 ¶ 50.) Ultimately, the remaining five counts were dropped, with the dismissal entry noting that there had been probable cause to file charges. (*See* Doc. 83-9.) The parties agree that there is no Sixth Circuit law proposing that a hung jury or dropped charges equal a favorable resolution for a plaintiff. And this Court has already taken note of precedent from the Second Circuit suggesting that the opposite is true. (*See* Doc. 29 (quoting *Singleton v. City of New York*, 632 F.2d 185, 193 (2d Cir. 1980) ("Proceedings are terminated in favor of the accused only when their final disposition is such as to indicate the accused is not guilty.")))

Accordingly, because Detective Clark's investigation was based on probable cause, and because the underlying criminal proceedings were not wholly resolved in Thornton's favor, Plaintiffs' malicious prosecution claim against Detective Clark fails.

## I. Count IX – § 1983 (Violation of Guilford Thornton's Fourth, Sixth, and Fourteenth Amendment Rights)

Count IX of Plaintiffs' Amended Complaint alleges that the City and Detective Clark violated Thornton's Fourth, Sixth, and Fourteenth Amendment rights.  (*See* Doc. 30 ¶¶ 105–08.) According to Plaintiffs, Detective Clark's and the City's failure to conduct a proper investigation "facilitated" the Officers' ability to put on perjured testimony at trial and impaired Thornton's ability to present a complete defense.  (*See id.*)

As an initial matter, it is unclear how Plaintiffs' "failure to conduct a proper investigation" claim differs from their meritless malicious prosecution claim in Count VIII.

As for Plaintiffs' claim that Thornton's Sixth Amendment right to counsel was violated, the evidence in the record establishes that Security Guard Neu at Grant Medical Center briefly prevented Thornton's attorney from visiting him, as she was following the hospital's policy about patient visits.  Neither Detective Clark nor anyone else from the City prevented Thornton's attorney from visiting him.  In fact, the City ensured that Thornton was able to have access to his attorney later that day.

For all of these reasons, Detective Clark is entitled to summary judgment on Count IX.

## J. Count XI – Intentional Infliction of Emotional Distress

Finally, Plaintiffs bring a claim for intentional infliction of emotional distress against all

Defendants.[12] (*See* Doc. 30 ¶¶ 117–20.) Plaintiffs concede that this claim fails to the extent it is partially based on the shooting of Thornton, but argue that it should survive to the extent it is based on "Defendants' conduct in providing false information during the investigation." (Doc. 90 at 29.) Again, because there is no evidence in the record that anyone involved in the investigation provided false information, aside from Plaintiffs' speculation, this claim fails.

### III.    CONCLUSION

For all of these reasons, Defendants' motions for summary judgment are **GRANTED** in full. This case is **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED**.


____s/ Algenon L. Marbley_____
**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**


**Dated: June 14, 2017**

---

[12] Plaintiffs likely overlooked the inclusion of the City in their IIED claim in the Amended Complaint, because the Court previously dismissed all state-law claims against the City with prejudice. (*See* Doc. 29.)